IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WEST FRANKLIN PRESERVATION　　　　)
LIMITED PARTNERSHIP,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
NUTUR NORTH CAROLINA, LLC,　　　　　)
d/b/a Aveda Institute of Carolinas-Chapel Hill;　)
NUTUR HOLDINGS LLC;　　　　　　　　)
PATRICK J. THOMPSON; and　　　　　　　)
MOLLY M. THOMPSON,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　　1:14CV266
　　　　　　　　　　　　　　　　　　　)
NUTUR NORTH CAROLINA, LLC,　　　　　)
d/b/a Aveda Institute of Carolinas-Chapel Hill,　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Counter-Claim and　　　　)
　　　　　　　　Third-Party Plaintiff,　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
WEST FRANKLIN PRESERVATION　　　　)
LIMITED PARTNERSHIP and ANTOINE　　)
PUECH,　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Counter-Claim and　　　　)
　　　　　　　　Third-Party Defendants.　　)
_____　)

## MEMORANDUM OPINION AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on Defendants Patrick J. Thompson's and Molly

M. Thompson's Motion for Partial Summary Judgment [Doc. #45]; Plaintiff West Franklin

Preservation Limited Partnership's ("West Franklin's") Motion for Summary Judgment on its

Claims [Doc. #47]; and West Franklin's and Antoine Puech's Motion for Summary Judgment as to the Counterclaim and Third Party Complaint of Nutur North Carolina, LLC ("Nutur") [Doc. #49]. For the reasons that follow, Patrick J. Thompson's and Molly M. Thompson's Motion for Partial Summary Judgment should be denied. In addition, West Franklin's Motion for Summary Judgment on its Claims and West Franklin's and Antoine Puech's Motion for Summary Judgment as to the Counterclaim and Third Party Complaint of Nutur North Carolina, LLC should be granted in part and denied in part.

I.    FACTS, CLAIMS, AND PROCEDURAL HISTORY

    This matter arises from the alleged breach of two leases of adjoining commercial property owned by West Franklin in the town of Chapel Hill, North Carolina (the "Town"). The general facts regarding the lease agreements and subsequent default are not in dispute. Nutur entered into an agreement with West Franklin for the lease of Pavilion II at 200 West Franklin Street, Chapel Hill, North Carolina, effective June 24, 2004 (the "Pavilion II Lease"), and for the lease of Pavilion I at 206 West Franklin Street, Chapel Hill, North Carolina, effective August 19, 2005 (the "Pavilion I Lease"). The Leases were executed by Antoine Puech as General Manager of West Franklin and by Patrick Thompson as President of Nutur. On June 25, 2004, Patrick Thompson and Molly Thompson executed the Pavilion II Lease Guaranty, personally guaranteeing payment of certain obligations under the Pavilion II Lease, and, on August 19, 2005, the Thompsons executed the Pavilion I Lease Guaranty, under the same terms. Each Guaranty includes the following language:

        [The guaranty] . . . shall remain in full force and effect from and after the date hereof until the expiration of the term of all Obligations or the [sic] until the

2

fifth (5th) anniversary of the [Pavilion II Lease] Minimum Net Rent Commencement Date, whichever shall first occur, and if any liability of the Guarantors to make payment or otherwise perform hereunder shall have arisen, until the date on which such liability shall have been fully performed.

(Pavilion II Guaranty [Doc. #9-3] ¶ 1; Pavilion I Guaranty [Doc. #9-5] ¶ 1.) The Minimum Net Rent Commencement Date is defined in Section 1.01(n) of the Pavilion II Lease Agreement as January 1, 2005. (See Pavilion II Lease [Doc. #9-1] § 1.01(n).)

Nutur opened and operated an Aveda Institute in the leased premises – "a cosmetology and esthetics school where its students provide retail and salon and spa services to the public." (Defs.' Resp. [Doc. #69] at 2.) However, Nutur had difficulty making rent payments as they became due (First Am. Answer & Countercl. [Doc. #37] at 5-6), and, by the end of 2008, was in significant arrears. On January 1, 2009, in order "to evidence the rent, additional rent and other charges past due and owing under maker's lease on the Pavilion I and Pavilion II premises at 200 West Franklin Street in Chapel Hill, NC," Nutur Holdings, LLC ("Nutur Holdings"), the sole owner of Nutur, as well as the Thompsons, as co-makers, executed a Promissory Note in the amount of $143,009.50 in favor of West Franklin. (See Jan. 1, 2009 Promissory Note [Doc. #9-6] at 1.)[1] Due to a continued failure to make either the lease payments or the additional catch up payments required by the Promissory Note, the January 1, 2009 Promissory Note was replaced by a second note in July 31, 2009, in an amount of $270,627.10. (See July 31, 2009 Promissory Note [Doc. #9-6] at 2.) Subsequently, on December 31, 2009, Nutur Holdings and the Thompsons replaced the second note with a

---

[1] According to Defendants' First Amended Answer & Counterclaims [Doc. #37], Nutur is 100% owned by Nutur Holdings (see id. ¶ 14) and Patrick Thompson serves as President of both entities (see id. ¶¶ 4, 24).

third note, in the amount of $265,716.32. (See December 31, 2009 Promissory Note [Doc. #9-6] at 3.)

West Franklin declared default under the Leases and the third promissory note on March 31, 2011, and demanded payment from Defendants. However, as a result of further efforts to resolve these disputes, in June 2011, West Franklin rolled the third note into a $260,955.82 Restated Promissory Note, executed by Nutur, Nutur Holdings, and the Thompsons as co-makers. (See June 30, 2011 Restated Promissory Note [Doc. #9-11] at 1.) The Restated Promissory Note states that it "is given to evidence indebtedness for rent, additional rent and other charges past due and owing under [Nutur's] lease of the Pavilion I and Pavilion II premises located at 206 and 200 West Franklin Street in Chapel Hill, Orange County, North Carolina." (Id. at 3.) On July 1, 2011, West Franklin, Nutur, and the Thompsons also executed a Forbearance Agreement, through which West Franklin agreed to forbear its rights under the previous agreements in exchange for payment on or before December 31, 2012. (See July 1, 2011 Forbearance Agreement [Doc. #9-10] ¶¶ 2-3.)

Ultimately, Defendants failed to pay, and West Franklin declared defaults under the Restated Promissory Note, the Leases, the Lease Guaranties and the Forbearance Agreement on December 26, 2013. West Franklin brought this action in the Superior Court of Orange County alleging claims for: (1) Breach of Contract: Pavilion II Lease; (2) Breach of Contract: Pavilion I Lease; and (3) Breach of Contract: Restated Note. (See Compl. [Doc. #9].) Defendants removed this action to this Court on March 28, 2014. (See Pet. for Removal [Doc. #1].) Defendants filed an Answer and Counterclaim [Doc. #12], and subsequently a

4

First Amended Answer and Counterclaim [Doc. #37], asserting counterclaims against West Franklin for: (1) Breach of Section 2.06(a) (Quiet Enjoyment); (2) Breach of Section 2.01(b) (Common Areas); (3) Breach of Section 2.05(d) (Signage); (4) Breach of Section 3.01(a) (Wear and Tear); (5) Breach of Section 3.02(b) (Operating Expenses); and (6) Breach of Section 3.01(b) (Parking). Defendants also asserted counterclaims against both West Franklin and Anoine Puech for Fraud; Fraudulent Inducement; and Unfair and Deceptive Trade Practice.

Defendants' counterclaims primarily relate to construction by the Town that occurred adjacent to the leased properties. That construction commenced in December 2010 (see A. Puech Decl. [Doc. #52] ¶ 17; Ex. 1 [Doc. #52-1]) and lasted for approximately 28 months. Defendants contend that the Town construction severely hindered their ability to conduct their intended business. (See P. Thompson Decl. [Doc. #69-1] ¶¶ 16-22.) Mr. Thompson avers that, at times, "the developers blasted dynamite that physically shook the premises," and that a nearby municipal parking lot, Lot 5, on which Defendants relied, "was destroyed [and that] roads and sidewalks were closed and foot traffic was redirected to the opposite side of the street during portions of the construction." (Id. ¶¶ 17-18.) Further according to Mr. Thompson, the Town erected fences that "frequently blocked [Defendants'] access to the common areas and impacted the ability to put up adequate signage and prevented the existing signage from being visible." (Id. ¶ 19.)

Mr. Thompson also averred that, in early 2004, during negotiations related to the Leases, he made clear that the availability of nearby parking was critical to Nutur and would be an important issue in deciding whether to enter the lease and, in fact, that "the availability of

5

parking in Lot #5 was the only reason that Pavilion II would qualify for approval by Aveda Corporation." (Id. ¶ 4.) According to Mr. Thompson's testimony, "Mr. Puech stated . . . that parking lot 5 was a dedicated public lot and that the spaces cannot be taken away." (P. Thompson Dep. [Doc. #69-6] at 229:23-25.) Defendants now contend that, during depositions related to this action, they learned for the first time that Mr. Puech was aware of the likelihood of construction at the time he made those statements. Defendants point to Mr. Puech's own deposition, in which he testified that he knew consultants had been looking at developing Lot 5 for some period of time (A. Puech Dep. [Doc. #69-8] at 21:14-17), and that, shortly after execution of the Lease for Pavilion II, he, in fact, submitted a bid to develop Lot 5. (A. Puech Dep. [Doc. #69-4] at 46:18-19.) Defendants also point to an October 27, 2004 letter written by the Town's "Downtown Commission," on letterhead reflecting Mr. Puech's name, addressed to the Mayor of Chapel Hill and the Town Council, relaying concerns that "[l]oss of parking, disruption of trash services, and blocking streets and alleys [during the estimated four-year construction period] will be stressful for business owners and [ ] customers." (Oct. 27, 2004 Letter [Doc. #69-5] at 2.)[2]

Mr. and Ms. Thompson have now moved for partial summary judgment on the claims against them [Doc. #45], contending that, under the terms of the Guaranties, they cannot be held personally liable for obligations incurred after December 31, 2009. West Franklin has moved for summary judgment in its favor on all claims it has asserted against Defendants

---

[2] Defendants refer to the Downtown Commission as "Dr. Puech's commission." (Defs.' Resp. [Doc. #69] at 7.) While Mr. Puech acknowledged that he was, for some period of time, a part of the Downtown Commission, he testified that he could not recall if he was a member at the time this letter was written and that the letter was written without his knowledge. (A. Puech Dep. [Doc. #69-8] at 32-33.)

[Doc. #47], and West Franklin and Antoine Puech have moved for summary judgment in their favor on all of Defendants' counterclaims [Doc. #49].

## II.    STANDARD

A court must grant summary judgment if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party.   Id.   The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact."   Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).   If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."   Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).   A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in the light most favorable to the non-moving party.   Anderson, 477 U.S. at 255.

## III.    DISCUSSION

   A.    Defendants Patrick J. Thompson and Molly M. Thompson's Motion for Partial
      Summary Judgment [Doc. #45]

The Thompsons contend that they may be held personally liable only for obligations incurred prior to January 1, 2010.   In that regard, the Thompsons point to the following language contained in each of the Guaranties:

7

> [The Guaranties] . . . shall remain in full force and effect from and after the date hereof until the expiration of the term of all Obligations or the [sic] until the fifth (5th) anniversary of the [Building 200] Minimum Net Rent Commencement Date, whichever shall first occur, and if any liability of the Guarantors to make payment or otherwise perform hereunder shall have arisen, until the date on which such liability shall have been fully performed.

(Pavilion II Guaranty [Doc. #9-3] ¶ 1; Pavilion I Guaranty [Doc. #9-5] ¶ 1.)  Given the January 1, 2005 Minimum Net Rent Commencement Date as defined in Section 1.01(n) of the Pavilion II Lease Agreement, the Thompsons argue that their Guaranties expired on January 1, 2010 such that, as of that date, they could no longer incur additional personal liabilities.

The Thompsons' position is unaltered by consideration of the clause stating that "if any liability of the Guarantors to make payment or otherwise perform hereunder shall have arisen, until the date on which such liability shall have been fully performed."  The Thompsons contend that clause only indicates that their obligation which had arisen prior to January 1, 2010, would not expire, but not that they may incur additional obligations.  As stated in their supporting brief, "[t]he Thompsons do not dispute that they are personally liable for the obligations encompassed in the Restated Promissory Note and Forbearance Agreement that arose prior to January 1, 2010."  (Pls.' Br. [Doc. #46] at 9.)

West Franklin takes a different view of that provision and of its "arisen clause."  West Franklin contends that, because a "liability of the Guarantors to make payment . . . ha[d] arisen" prior to January 1, 2010, the Guaranties, under their terms, instead remained in effect in their entirety "until the date on which such liability ha[d] been fully performed," and, as such, the Thompsons' ability to incur additional obligations remained ongoing.  West Franklin posits that "[t]he 'arisen' clause in the Lease Guaranties has commercially [sic]

8

rationale: the guarantor does not get the benefit of an expiration date unless his principal's payments are then current. Such a clause is an incentive for the guarantor to ensure the financial obligations of its principal are current prior to the expiration date." (West Franklin's Resp. [Doc. #66] at 10.)

Under North Carolina law,

> "it is the general law of contract that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument. When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties. However, extrinsic evidence may be consulted when the plain language of the contract is ambiguous. Whether or not the language of a contract is ambiguous is a question for the court to determine. In making this determination, words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible."

Stovall v. Stovall, 205 N.C. App. 405, 410, 698 S.E.2d 680, 684 (2010) (quoting Lynn v. Lynn, 202 N.C. App. 423, 432, 689 S.E.2d 198, 204-05 (2010)). "An ambiguity exists in a contract when either the meaning of words or the effects of provisions is uncertain or capable of several reasonable interpretations . . . [or] where the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties." Myers v. Myers, 213 N.C. App. 171, 175, 714 S.E.2d 194, 198 (2011) (internal quotation marks omitted).

In this case, the language contained in each of the Guaranties regarding termination is ambiguous. It is unclear whether liabilities arising prior to January 1, 2010 alone extend beyond the stated expiration date or whether, given that liabilities had arisen, the Guaranties, in their entirety, remained in effect. Accordingly, because both West Franklin's and

Defendants' positions are reasonable, the Court cannot, as a matter of law, settle the matter of the Thompsons' personal liability based solely on the language of the Guaranties.

Moreover, even if the language of the Guaranties could be resolved as the Thompsons contend, an additional issue remains. Specifically, West Franklin contends that the Thompsons' subsequent execution of the Forbearance Agreement evidences the Thompsons' personal liability as to obligations incurred after January 1, 2010. That is, West Franklin contends that "the 2011 Forbearance Agreement on its face obligates Mr. and Ms. Thompson, in their capacities as Guarantors, to (a) pay the Arrearages and (b) as a 'continuing' obligation, to 'perform promptly and without delay all obligations as set forth in the Building 200 Lease and the Building 206 Lease, including, without limitation, the payment of Rent and other charges as and when due.'" (Resp. [Doc. #66] at 14-15.) With respect to the Arrearages, West Franklin points to Paragraph 3 of the Forbearance Agreement, which provides:

> <u>Payment of Arrearages</u>: The Nutur NC Parties agree to pay all Arrearages to Lessor, in full, on or before December 31, 2012. In the event payment in full of all Arrearages is not received by Lessor on or before December 31, 2012, Lessor's forbearance as set forth in Section 2 above shall terminate without further notice to the Nutur NC Parties and Lessor may then thereupon exercise any and all rights and remedies that Lessor may have as against any one or more of the Nutur NC Parties under the Building 200 Lease, and Building 200 Lease Guaranty, the Building 206 Lease, the Building 206 Lease Guaranty, at law and/or in equity as a consequence of any one or more of the Arrearages.

(Forbearance Agreement [Doc. #9-10] ¶ 3.) The "Nutur NC Parties" are defined in the Forbearance Agreement as "Lessee [Nutur] and each of the Guarantors [the Thompsons]." (<u>Id.</u> at 1-2.) "Arrearages" are defined as:

> (i) any and all past due Rent, late payment charges, interest, operating expense (CAM) charges, annual reconciliation adjustments, repair

10

reimbursements and other charges due and owing by Lessee pursuant to the Building 200 Lease (Pavilion II) as shown on the attached accounts receivable aging statement dated as of July 1, 2011; and (ii) all past due Rent, late payment charges, interest, operating expenses (CAM) charges, annual reconciliation adjustments, repair reimbursements and other charges due and owing by Lessee pursuant to the Building 206 Lease (Pavilion I) as shown on the attached accounts receivable aging statement dated as of July 1, 2011 which is incorporated herein by this reference.

(Forbearance Agreement [Doc. #9-10] ¶ 1(a).)

In addition, the July 1, 2011 Forbearance Agreement states, under "Continuing Lease Obligations," that: "Except to the limited extent otherwise expressly provided in this Agreement, the Nutur NC Parties covenant and agree to perform promptly and without delay all obligations set forth in the Building 200 Lease and the Building 206 Lease, without limitation, the payment of Rent and other charges when and as due." (Id. at 3-4.) The same definition of the "Nutur NC Parties" applies. West Franklin contends that the Forbearance Agreement stands on its own to obligate the Thompsons individually to pay the arrearages and the ongoing lease obligations.

In addition, West Franklin contends that the language in the Forbearance Agreement (1) constitutes admissions by the Thompsons that their liabilities on the Guaranties have continued beyond January 1, 2010; (2) ratifies the Thompsons' continuing obligations under the Lease Guaranties; (3) revived the Thompsons' liabilities under the Lease Guaranties; or (4) estops the Thompsons from now claiming that they are not personally obligated because West Franklin reasonably relied on the Thompsons' promise to pay the Arrearages and all obligations under the Leases when it agreed to forbear in collection of the sums owed. (West Franklin's Resp. [Doc. #66] at 16-17.) In response, the Thompsons contend that the

Forbearance Agreement is simply an agreement to forebear in exchange for payment, but did not revive, expand or extend the terms of the Lease Guarantees.

Having considered the parties' contentions, the Court concludes that the language in the Forbearance Agreement is ambiguous, and resolution of the parties' competing interpretations is a matter for the jury. Specifically, given West Franklin's contentions and interpretation of the Forbearance Agreement, the Court cannot say as a matter of law that the Thompsons did not personally assume any ongoing or accumulated liability after January 1, 2010. However, the Court also cannot say, as a matter of law, that by entering into that Forbearance Agreement, the Thompsons admitted, ratified, revived, or should be equitably estopped from arguing the expiration of their personal liability under the Guaranties.[3] Thus, interpretation of the language employed in the Forbearance Agreement, whether standing alone or as evidence to suggest the proper understanding of the Guaranties, cannot be determined as a matter of law and is better resolved by the finder of fact. Ultimately, the Court cannot conclude that there are no genuine issues of material fact regarding the Thompsons' personal liability. Thus, this issue should remain for trial.

B. West Franklin's and Antoine Puech's Motion for Summary Judgment as to the Counterclaims and Third Party Complaint of Nutur [Doc. #49]

West Franklin and Antoine Puech have moved for summary judgment seeking dismissal of the claims asserted by Nutur against West Franklin and Mr. Puech. As set out

---

[3] In its Response to the Thompson Defendants' Motion for Summary Judgment, West Franklin goes beyond simply arguing that summary judgment should be denied as to the Thompson Defendants' personal liability, and argues that summary judgment should in fact be entered in its favor based on the language of the Forbearance Agreement. While West Franklin has not moved for summary judgment in its favor on this particular issue, the Court nevertheless notes that the disputed facts render improper any determination of this issue as a matter of law.

previously, Nutur brings claims against West Franklin for breach of contract (Counts 1 through 6), and against West Franklin and Antoine Puesch for fraud (Count 7), fraud in the inducement (Count 8) and unfair and deceptive trade practices (Count 9). The Court will consider each count in turn.

>        i.        Count I: Breach of Section 2.06(a) (Quiet Enjoyment)

Section 2.06(a) of the Lease provides as follows:

> (a) <u>Quiet Enjoyment</u>. Subject to all terms, conditions and covenants set forth in this Agreement and Lessee's compliance therewith, Lessee shall enjoy the quiet and useful benefit of the Premises free from interruption by Lessor or any person or entity claiming through Lessor.

(Pavilion II Lease [Doc. #9-1] § 2.06(a); Pavilion I Lease [Doc. #9-4] § 2.06(a).)

Nutur claims that West Franklin breached this provision of the Leases, and in its Motion for Summary Judgment on this claim, West Franklin argues that the disruptions complained of by Defendants were caused not by West Franklin, but by a third party over which West Franklin had no control. West Franklin contends that it is therefore entitled to summary judgment on this claim. Defendants did not respond to this argument in their Response, and, it is therefore considered waived. (<u>See</u> Defs.' Resp. [Doc. #69].) <u>Satcher v. Univ. of Ark. At Pine Bluff Bd. of Trs.</u>, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").[4] Regardless, there is no evidence that West Franklin, or anyone "claiming through" West Franklin, took any steps to

---

[4] While not addressing this claim specifically, in their Response, Defendants state that "[i]n the interest of efficiency, Defendants focus on the most substantial of West Franklin's breaches." (Defs.' Resp. [Doc. #69] at 23.) However, by pointing to the absence of a genuine issue of material fact, West Franklin "shift[ed] [the burden] to [Defendants] to come forward with facts sufficient to create a triable issue of fact." <u>Temkin</u>, 945 F.2d at 718-19 (citing <u>Anderson</u>, 477 U.S. at 247-48). By not responding to this argument, Defendants have failed to carry that burden.

interrupt Defendants' enjoyment of the premises. In fact, Defendants' own allegations describe only actions taken by the Town. (See First Am. Answer & Countercl. [Doc. #37] ¶¶ 60-67.) Accordingly, the Court should grant summary judgment in West Franklin's favor as to Nutur's claim for breach of Section 2.06(a) of the Leases.

ii. Count II: Breach of Section 2.01(b) (Common Area)

Section 2.01(b) of the Lease provides as follows:

> (b) <u>Common Area Usage</u>. Subject to the terms, conditions and covenants set forth in the this Agreement and in the Regulations, Lessee and its employees, guests, customers, licensees and invitees while doing business with Lessee shall have the non-exclusive right and privilege of using the Common Area together with Lessor, other lessees of the Building and their respective employees, guests, customers, licensee and invitees.

(Pavilion II Lease [Doc. #9-1] § 2.01(b); Pavilion I Lease [Doc. #9-4] § 2.01(b).)

West Franklin again argues that it is entitled to summary judgment as to this claim because "[t]here is no evidence West Franklin interfered in any way with Nutur's non-exclusive use of the Common areas of the 200 and 206 Buildings." (West Franklin's Br. [Doc. #50] at 14.) Moreover, West Franklin points to the declaration of Mr. Puech for its statement that "[n]one of the Town's construction encroached on Nutur's Premises or the Common Area." (West Franklin's Br. [Doc. #50] at 14 (citing A. Puech Decl. [Doc. #52] ¶ 28).) In Response, Defendants point to Mr. Thompson's competing declaration, in which he states: "The erection of fences frequently blocked our access to the common areas . . . ." (Thompson Decl. [Doc. #69-1] ¶ 19.)

There does not appear to be any dispute that any restriction on Nutur's use of the common areas was not caused by West Franklin directly, or anyone other than the Town, and

there is no evidence, or contention, that West Franklin had any control over the Town's construction activities. However, this provision of the Lease is stated more broadly than prohibiting only acts by West Franklin or anyone acting through West Franklin, and it is not clear whether Nutur remained able to access and enjoy use of the common areas during the period of the construction as they were entitled under the foregoing provision.

Both sides have submitted only contrary declarations regarding the effect, if any, of the Town's construction on use of the common areas. However, neither side has adequately described what parts of the property constitute the common areas, nor made any attempt to provide actual evidence of access to, or obstacles to the use of, those common areas during the construction period beyond declarations. Although the briefing includes certain photographs of the Town's construction, those reflect only a single moment in time, and, again, given that the Court is left without a clear understanding of the common areas at issue, the Court can make no determination of whether they are even depicted in those photographs. Ultimately, in the face of little more than competing declarations, the Court concludes that West Franklin has failed to point to the absence of a genuine issue of material fact so as to shift the burden to Nutur, and accordingly, the Court cannot conclude that judgment should be granted on Nutur's claim for Breach of Section 2.01(b) (Common Area).

      iii.     Count III: Breach of Section 2.05(d) (Signage)

Section 2.05(d) provides in relevant part as follows:

> Lessee, with Lessor's prior approval which shall not be unreasonably withheld or delayed, shall be permitted to (i) mount its trade name sign in Lessee's standard letter inside the entry of the Building or inside the windows which are

15

part of the Premises, and (ii) affix window appliques and other treatments at the Premises that are commonly used by Lessee.

(Pavilion II Lease [Doc. #9-1] § 2.05(d); Pavilion II Lease [Doc. #9-4] § 2.05(d).) West Franklin again argues that "[t]here is no evidence West Franklin impeded in any way Nutur's ability to put advertising signage on its windows." (West Franklin's Br. [Doc. #50] at 15.) West Franklin also argues that "[t]here is no evidence in this record that Nutur ever presented a window or other signage request to West Franklin during the Town Lot 5 construction period for approval other than a single request to approve a banner sign on the exterior of an upper floor of the 200 Building [which] West Franklin promptly approved . . . conditioned only on there being no objection from the upstairs tenant." (Id. at 16.) In Response, Defendants contend that the signage provision "is clearly for advertising purposes, and thus unobstructed signage is required." (Defs.' Resp. [Doc. #69] at 22.) Defendants also point to the declaration of Mr. Thompson, in which he states: "The erection of fences frequently . . . impacted our ability to put up adequate signage and prevented the signage from being visible." (P. Thompson Decl. [Doc. #69-1] ¶ 19.)

In considering these contentions, the Court notes that the provision at issue addresses only Nutur's ability to erect signage and West Franklin's obligation to give prompt approval. Issues regarding visibility are not addressed and provide no basis, on these facts, for liability against West Franklin. To the extent West Franklin allowed signage, and to the extent it did not unreasonably withhold its approval or delay in making a decision, West Franklin satisfied its obligations under this provision. Thus, because Section 2.05(d) makes no representations regarding the visibility of signage, because the only evidence before the Court is that Nutur's

sole request for signage was permitted (A. Puech Decl. [Doc. #52] ¶ 31), and because

Defendants point to no evidence that Nutur made requests for signage or appliques which

were unreasonably denied by West Franklin, the Court should grant summary judgment in

West Franklin's favor on Nutur's claim for violation of Section 2.05(d).

        iv.     Count IV: Breach of Section 3.01(c) (Wear and Tear)

Section 3.01(c) allocates proper responsibility for maintenance of the two properties.

In full, it states as follows:

> (c) <u>Repair and Maintenance</u>. During the term of this Agreement, Lessor shall keep in good repair, at its expense, the structural portions of the roof, foundation and exterior walls of the Building (exclusive of glass), all common electrical, plumbing, cable, security and HVAC systems, and all utility and sewer pipes exterior to the Premises; provided, however, that Lessee shall be responsible for payment of any repairs required solely as the consequence of any negligent act or omission by, or willful misconduct or, Lessee or any employee, guest, agent, customer, contractor, licensee, invitee or sublessee of Lessee. The cost of any such repair shall be paid by Lessee as Additional Rent. During the term of this Agreement, Lessor shall further keep in good condition and repair, and perform periodic maintenance of, the Common Area and the roof membrane. The cost of such repair and maintenance shall be included as a component of Operating Expense. Lessor shall be responsible for normal wear and tear associated with Lessee's ordinary and reasonable use of the Premises for the operation of its business in accordance with the terms of this Agreement. Nothing contained in this paragraph or elsewhere in this Agreement shall preclude or prevent Lessor from making the repairs or performing the maintenance required of Lessee in paragraph 3.02(i) should Lessee fail to do so after demand and after the lapse of any applicable notice and cure period; provided, however, that the costs of any such repairs and/or maintenance shall be paid by Lessee as Additional Rent.

(Pavilion II Lease [Doc. #9-1] § 3.01(c); Pavilion I Lease [Doc. #9-4] § 3.01(c).)

In its First Amended Answer and Counterclaim, Nutur alleges that the Leases obligated

West Franklin to cover expenses for ordinary wear and tear of the premises, but that West

Franklin instead allocated all expenses to Nutur as repair and maintenance items for which Nutur is responsible under the Leases. (First Am. Answer & Countercl. [Doc. #37] ¶¶ 80-85.) West Franklin argues that the provision in the Leases, when read in conjunction with other related subsections, are clear, and that the property manager, Ms. Gunn, in her deposition, accurately described the distinction between "wear and tear" and "repair and maintenance." (West Franklin's Br. [Doc. #50] at 17.) Defendants acknowledge their obligation for certain maintenance items under the relevant provisions of the Leases, but continue to assert that "[t]he issue for this claim is that West Franklin wrongly billed Nutur for everything, leaving nothing for the wear and tear obligations." (Defs.' Resp. [Doc. #69] at 24.) Defendants argue that "[w]hether the charges West Franklin passed on to Nutur are proper wear and tear or are repair and maintenance is a disputed issue of fact." (Id.)

The instant dispute appears to present two issues: (1) the proper interpretation of the foregoing provision; and (2) whether the charges as allocated to Nutur were appropriate under that interpretation. The Court can answer neither at this stage. That is, Ms. Gunn's deposition testimony is insufficient to address the proper interpretation of the foregoing provision, and, as such, the Court cannot address the propriety of the distinction between the charges that were actually incurred and charged. Accordingly, summary judgment at this stage on Defendants' claim for breach of the "Wear and Tear" provision of the leases should be denied.

v.    Count V: Breach of Section 3.02(b) (Operating Expenses)

18

Section 3.02(b) states, in relevant part, that "in no event shall Lessee's pro rata share of annual Operating Expenses decrease in any calendar year or increase by more than three percent (3%) over Lessee's pro rata share of Operating Expenses for the preceding calendar year." (Pavilion II Lease [Doc. #9-1] § 3.01(c); Pavilion I Lease [Doc. #9-4] § 3.01(c).)

In the First Amended Answer and Counterclaim, Nutur contends that West Franklin violated the Operating Expenses provision by (1) increasing annual operating expense by more than 3%; and (2) including what Defendants contend is an unreasonable management fee of 4%. (See First Am. Answer & Countercl. [Doc. #37] ¶¶ 89-90.) In its instant Motion for Summary Judgment, West Franklin argues that neither basis supports a claim for violation of the Operating Expenses provision. (See West Franklin's Br. [Doc. #50] at 18-10.) Defendants respond only regarding their contention that, by increasing or decreasing the amount owed for operating expenses by more than 3%, West Franklin breached the Leases. (See Defs.' Resp. [Doc. #69] at 24-25.) Accordingly, the Court will not address any argument that West Franklin's 4% management fee constitutes a separate basis for breach of the Lease Agreements, and will consider that argument waived.

As to the argument that West Franklin increased or decreased the operating expenses by more than 3% in violation of the terms of the Leases, West Franklin contends that "Nutur has yet to provide any accounting in support of its obligations." (West Franklin's Br. [Doc. #50] at 18.) West Franklin also contends that Nutur never objected to the payments prior to litigation and that "[a]bsent objection and protest, and certainly after payment, the amounts billed, collected and applied are presumptively correct." Id. In response, Defendants argue

that, regardless of any presumption, Ms. Gunn admitted, in her deposition, that the amounts billed were not accurate and, in some instances, increased or decreased by more than 3%.

As Defendants note, Ms. Gunn admitted that, in certain years, operating expenses were increased or decreased by more than 3% in violation of the terms of the Leases. (See B. Gunn Dep. [Doc. #69-11] at 22-23.) Although Ms. Gunn also states that she subsequently corrected that error, the evidence is nonetheless sufficient for a reasonable finder of fact to conclude that, for at least some period of time, West Franklin violated the operating expenses provisions of the Leases. Ms. Gunn's subsequent corrections more appropriately address whether Nutur would be actually entitled to recover any damages for this claim, but would not foreclose the claim itself. See Hodges v. Young, 209 N.C. App. 753, 710 S.E.2d 708, 2011 WL 721009, at *2 (2011) (unpublished table decision) ("Unlike claims of negligence, the existence of damages is not an element of a *prima facie* claim for breach of contract. . . . As such, [the plaintiff's] ability to prove damages arising from Defendants' alleged breach of the contract is irrelevant in a summary judgment hearing, and entry of summary judgment based on the theory that [the plaintiff] failed to prove damages would have been in error." (internal citations omitted)).

vi.    Count VI: Breach of Section 3.01(b) (Parking)

In relevant part, Section 3.01(b) of the Pavilion II Lease provides as follows:

Parking.  Subject to the limitations set forth below, during the initial term of this Agreement and any renewal term, Lessor shall provide to Lessee such parking spaces as Lessee shall request, but in no event more than twenty-five (25) parking spaces.  Not more than four (4) of the parking spaces will be located behind the 206 building (located to the north of the Building).   The remaining parking spaces will be located in Lessor's Rosemary Street lot or in

the municipal lot located on the east side of Church Street [(*i.e.*, Lot 5)]. . . . Notwithstanding the foregoing, Lessor's ability to provide the above-described or any other parking spaces to Lessee during the initial term of this Lease or any renewal term is dependent upon and subject to Lessor's ability to lease or otherwise acquire such parking spaces.

(Pavilion II Lease [Doc. #9-1] ¶ 3.01(b).)   Similarly, the Pavilion I Lease states:

> <u>Parking</u>.   Subject to the limitations set forth below, during the initial term of this Agreement and any renewal term, Lessor shall provide to Lessee such parking spaces as may be available.   The parking spaces will be located in Lessor's Rosemary Street lot or in the municipal parking lot located on the east side of Church Street [(*i.e.*, Lot 5)]. . . .   Notwithstanding the foregoing, Lessor's ability to provide the above-described or any other parking spaces to Lessee during the initial term of this Lease or any renewal term is dependent upon and subject to Lessor's ability to lease or otherwise acquire such parking spaces.

(Pavilion I Lease [Doc. #9-4] ¶ 3.01(b).)   West Franklin contends that, "[w]hen Town Lot 5 closed for construction in December 2010, West Franklin no longer had any ability to supply spaces in Lot 5.   It is not a violation of the Lease to provide spaces from other sources, and that is what West Franklin did before, during and after the closure of Lot 5."   (West Franklin's Br. [Doc. #50] at 20.)   Defendants, on the other hand, argue that the foregoing provisions do not simply obligate West Franklin to provide 25 spots, but instead require West Franklin to provide spaces in one of three lots: (1) 206 West Franklin, (2) Rosemary Street; or (3) Lot 5. Thus, according to Defendants, because "West Franklin did not provide Nutur with spaces in these lots, choosing instead to push Nutur to a lot significantly farther away," West Franklin breached the parking provision of the Leases.   (<u>See</u> Defs.' Resp. [Doc. #69] at 25-26.)

The Pavilion II Lease requires West Franklin to provide up to 25 spots at Nutur's request, and those 25 spots must be in one of the three explicitly named lots unless West Franklin is unable to lease or otherwise acquire spaces in those lots.   At this juncture, the

21

Court is unable to determine whether West Franklin met those obligations. West Franklin points to the declaration of Ms. Gunn, in which she avers that in each of 2010, 2011, 2012, and 2013, the years during which construction was ongoing, West Franklin provided Nutur with 24 spaces, all located in the Rosemary Lot. (B. Gunn Decl. [Doc. #54] ¶ 39.) Ms. Gunn further avers that in 2012, West Franklin provided Nutur 12 spaces located at a nearby restaurant and 10 spaces on Mallette Street, and that, in 2013, West Franklin provided 10 spaces on Mallette Street, all in addition to the 24 spaces provided in the Rosemary Lot. (Id. ¶¶ 39-40.) Likewise, Exhibit E to Ms. Gunn's Declaration indicates that, from January 1, 2010 through, at least, December of 2013, West Franklin invoiced Nutur for 24 spaces at the Rosemary Lot (see B. Gunn. Decl., Ex. E [Docs. #54-5 (Part 1), 54-6 (Part 2), 54-7 (Part 3)]), while Exhibit F appears to indicate the invoicing for the additional spots located at Mallette Street and at the restaurant lot (see B. Gunn Decl., Ex. F [Doc. #54-8]). However, in her deposition testimony, Ms. Gunn appears to indicate that it was a subset of the 24 spaces which were provided in the Mallette Street lot, as opposed to space in addition to the 24 already provided in the Rosemary Lot. (See B. Gunn Dep. [Doc. #69-13] at 105.) Accordingly, because it is not sufficiently clear whether the requested spots, up to 25, were provided in the three identified lots and, if not, whether West Franklin was unable to lease or otherwise acquire spaces in those lots, or whether Mr. Thompson agreed to any change, this issue should remain for the finder of fact.

vii.    Counts VII, VIII & IX: Fraud, Fraudulent Inducement, UDTPA

Nutur's fraud, fraudulent inducement, and UDTPA claims are asserted against both West Franklin and Antoine Puesch and are interrelated.    Nutur alleges that West Franklin, through Mr. Puech, represented to Nutur that Lot 5 would be available for parking by Nutur's customers and students through the term of the lease, that West Franklin, through Mr. Puech, was aware that this representation was false at the time it was made, and that West Franklin, through Mr. Puech, fraudulently concealed the fact that there were impending plans for substantial construction and development even though it was aware that parking was important to Nutur.    Specifically, Mr. Thompson contends that, during negotiations related to the Leases, he made clear to Mr. Puech that the availability of Lot 5 parking was critical to Nutur and would be an important issue in deciding whether to enter the lease (P. Thompson Decl. [Doc. #69-1] ¶ 4), and Mr. Thompson testified that "[t]he lease was entered into on the premise that [Nuture] would have access to the parking in Lot 5" (P. Thompson Dep. [Doc. #69-6] at 260:21-22).    According to Mr. Thompson, "Mr. Puech stated to [him] in January 2004 that parking lot 5 was a dedicated municipal lot and that the spaces cannot be taken away."    (P. Thompson Dep. [Doc. #69-6] at 229:23-25; see also P. Thompson Dep. [Doc. #69-7] at 75:1-4, 76:6-14.)[5]    According to Defendants, until Mr. Puech's October 17, 2014 deposition, they were unaware that at the time those statements were made, Mr. Puech actually

---

[5] Mr. Puech denies making that statement or saying words to that effect.    (See A. Puech Decl. [Doc. #52] ¶ 12.)

had knowledge of the potential construction and development. (First Am. Answer & Countercl. [Doc. #37] ¶¶ 96-104.)[6]

As to Nutur's fraud and fraudulent inducement claims, "[t]he essential elements of actionable fraud [and of fraudulent inducement] are: '(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" Becker v. Graber Builders, Inc., 149 N.C. App. 787, 794 561 S.E.2d 905, 910 (2002) (quoting Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)); TradeWinds Airlines, Inc. v. C-S Aviation Servs., 222 N.C. App. 834, 840, 733 S.E.2d 162, 168 (2012). Moreover, the reliance on any misrepresentation must be reasonable. See RD & J Props. v. Lauralea-Dilton Enters., LLC, 165 N.C. App. 737, 744, 600 S.E.2d 492, 498 (2004).[7] Here, West Franklin contends that Nutur's counterclaims must fail because there is insufficient evidence to create a genuine issue of material fact as to the following three elements: (1) that West Franklin and Mr. Puech made a false representation of or concealed a material fact; (2) that Nutur was deceived by the false representation or concealment; and (3) that Nutur's reliance upon any alleged false representation or concealment was reasonable.

---

[6] West Franklin argues that it is inappropriate to rely on a pre-contractual statement in the face of an integration clause. (See West Franklin's Br. [Doc. #50] at 26.) As Defendants note, evidence regarding fraudulent inducement may nonetheless be introduced. See Tradewinds Airlines, Inc. v. C-S Aviation Servs., 222 N.C. App. 834, 733 S.E.2d 162, 169-70 (2012).

[7] Proof of fraud would constitute a violation of North Carolina's unfair and deceptive trade practices act. See Hardy v. Toler, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975) ("Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts . . . ."); TradeWinds Airlines, Inc. v. C-S Aviation Servs., 222 N.C. App. 834, 840, 733 S.E.2d 162, 169 (2012) ("'Proof of fraud in the inducement necessarily constitutes a violation of Chapter 75 and shifts the burden of proof from the plaintiff to the defendant, which must then prove that it is exempt from Chapter 75's provisions.'" (quoting Media Network, Inc. v. Long Haymes Carr, Inc., 197 N.C. App. 433, 453, 678 S.E.2d 671, 684 (2009)).

a.    Sufficiency of Representation to Support Fraud Claim

As to the first contention, West Franklin and Mr. Puech argue that Mr. Puech's statement "is at best an ambiguous statement of opinion and, therefore, not actionable." (See West Franklin's Br. [Doc. #50] at 23.)   The statement attributed to Mr. Puech – i.e., that "the spaces in [lot #5] cannot be taken away" – appears to better be described as a statement of fact and is not in any way couched, as alleged and as testified to by Mr. Thompson, as only opinion. Regardless, "a jury should typically decide whether a statement is one of fact or opinion, and whether or not it was intended by its speaker to deceive." Int'l Designer Transitions, Inc. v. Faus Grp., Inc., 663 F. Supp. 2d 432, 443 n.8 (M.D.N.C. 2009) (citing Leftwich v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723 (1999)).   Moreover, even if West Franklin and Mr. Puech's assessment of the statement as opinion were accepted, "[a] statement purporting to be opinion may be the basis for fraud if, at the time it is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Leftwich, 134 N.C. App. at 508-09, 521 S.E.2d at 723.   Accordingly, this issue should remain for the finder of fact to decide.

West Franklin and Mr. Puech further contend that the Town never permanently took away any parking.   While West Franklin and Mr. Puech do not put this argument in context, they appear to argue that, because the parking spaces were eventually returned, the statement was not false, and thus cannot be the basis for any claim of fraud or of fraudulent inducement. However, even a temporary taking of the spaces in Lot 5 would appear inconsistent with the statement attributed to Mr. Puech and, thus, again, summary judgment is inappropriate.

25

b.    Actual Deception and Reasonable Reliance

West Franklin and Mr. Puech go on to argue the absence of any genuine issue of material fact regarding actual deception and the reasonableness of Defendants' reliance.   As to actual deception, West Franklin and Nutur contend that "[t]he fact that Mr. Thompson read and signed a document which clearly raised the possibility that West Franklin thought the public spaces in Lot 5 could be taken away precludes Nutur from being able to show actual deception."   (West Franklin's Br. [Doc. #50] at 24.)   In this regard, West Franklin and Mr. Puech point to the last sentence of the parking provision of the Leases, which states: "Notwithstanding the foregoing, Lessor's ability to provide the above-described or any other parking spaces to Lessee during the initial term of this Lease or any renewal term is dependent upon and subject to Lessor's ability to lease or otherwise acquire such parking spaces." (Pavilion II Lease [Doc. #9-1] ¶ 3.01(b); Pavilion I Lease [Doc. #9-4] ¶ 3.01(b).)   However, Nutur has alleged that Mr. Puech was aware of imminent construction involving Lot 5, and whether the clause in the Lease discloses that Lot 5 would be taken away is certainly not so clear as to warrant a finding of summary judgment in favor of West Franklin.   That is, that the Lease indicates that West Franklin may not have been able to obtain leases for the spots at issue does not necessarily mean the parking, in its entirety, would be eliminated during the term of the Leases and that West Franklin knew such an event would occur.

West Franklin and Mr. Puech go on to contend that there is no genuine issue of material fact regarding the reasonableness of Defendants' reliance for three reasons: (1) the foregoing language in the parking provisions of the Leases was sufficient to put a reasonable

person on inquiry about whether spaces in Lot 5 could be taken away (West Franklin's Br. [Doc. #50] at 25); (2) there are no facts that show Mr. Puech "used any type of artifice or scheme to deny Nutur an opportunity learn of the Town's interest in possible development of Lot 5" (id. at 26); and (3) Mr. Thompson's own professional background "makes it highly unlikely he could reasonably believe . . . that a governmental entity would have irrevocably committed in perpetuity for Lot 5 to be a parking lot" (id. at 27).

"In an arm's length transaction, when a purchaser of property has the opportunity to exercise reasonable diligence and fails to do so, the element of reasonable reliance is lacking and the purchaser has no action for fraud." RD & J Props., 165 N.C. App. at 746, 600 S.E.2d at 499. "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." Cobb v. Pennsylvania Life Ins. Co., 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011). "While the reasonableness of a party's reliance is usually a question for the jury, a court may grant summary judgment when the facts are so clear that they only support one conclusion." RD & J Props., 165 N.C. App. at 746, 600 S.E.2d at 499; see also Grubb Props., Inc. v. Simms Inv. Co., 101 N.C. App. 498, 501, 400 S.E.2d 85, 88 (1991)) ("[W]here the evidence is clear and shows without conflict that the claimant had both the capacity and the opportunity to discovery the mistake or discrepancy but failed to do so the absence of reasonable diligence is established as a matter of law." (citing Moore v. Fid. & Cas. Co., 207 N.C. 433, 177 S.E. 406 (1934)). However, "when a defendant 'resorts to [an] artifice . . . reasonably calculated to induce the purchaser to forgo investigation,' a plaintiff's reliance may still be reasonable." Angel v. Kelly, No. 1:01CV00435, 2006 WL

3479010, at *6 (M.D.N.C. Nov. 30, 2006) (citing <u>Calloway v. Wyatt</u>, 97 S.E.2d 881, 885-86 (N.C. 1957).)

Again, the facts here are not so clear as to support only one conclusion. West Franklin is correct that Defendants point to no evidence that Mr. Puech actively sought to conceal information related to the possible development of Lot 5, and West Franklin points to the public nature of the Town's construction efforts. However, the Court cannot resolve whether it would have been reasonable for an individual negotiating a lease to inquire regarding possible development of all properties surrounding the Leased premises, especially in the face of the representations, as alleged, that the parking would remain. <u>See, e.g.</u>, <u>Schade v. MBNA Am. Bank, N.A.</u>, No. Civ. 3:04CV633-H, 2006 WL 212147, at *9 (W.D.N.C. Jan. 26, 2006) (noting that whether investigation was reasonable was a question for the jury); <u>see also</u> <u>Fox v. S. Appliances, Inc.</u>, 264 N.C. 267, 271, 141 S.E.2d 522, 525-26 (1965) ("As otherwise expressed, the general rule is that the mere fact that public records, if examined, would show the representee that representations of fact are false does not preclude his establishing fraud, because he is under no duty to make such examination."). Similarly, even if the Court were to agree that Mr. Thompson's background makes it "highly unlikely" that he could have reasonably accepted Mr. Puech's alleged statements, it would remain an insufficient ground for summary judgment, as it is not the Court's role to resolve that factual question where an alternative conclusion does not appear unreasonable. Ultimately, questions regarding the statements actually made, actual deception and the reasonableness of Defendants' reliance and investigation are all factual issues that should remain for the finder of fact.

c.    Statute of Limitations

Finally, West Franklin argues that Nutur's fraud, fraudulent inducement and UDTPA claims are barred by the applicable statutes of limitations.   Under North Carolina law, there is a three year statute of limitations for fraud claims.   See N.C. Gen. Stat. § 1-52(9).   "This three-year clock begins running when plaintiff discovers—or should have discovered in the course of reasonable diligence—the fraud."   Hudgins v. Wagoner, 204 N.C. App. 480, 485, 694 S.E.2d 436, 442 (2010) (citing Forbis v. Neal, 361 N.C. 519, 524-25, 649 S.E.2d 382, 385-86 (2007)).   An unfair and deceptive trade practices claim must be brought within four years of the accrual of the cause of action, and, when based on fraud, accrues only at the time the fraud is discovery, or should have been discovered with the exercise of reasonable diligence.   Trantham v. Michael L. Martin, Inc., ___ N.C. App. ___, ___, 745 S.E.2d 327, 334 (2013).   When a fraud should have been discovered in the exercise of reasonable diligence generally is a question for the jury, especially when the evidence is "inconclusive or conflicting."   Hudgins, 204 N.C. App. at 485, 694 S.E.2d at 442.

According to West Franklin, "[t]he January 2014 statement attributed to Mr. Puech cannot be reconciled with the unambiguous language of the parking provisions in the 200 and 206 Building leases signed in June 21, 2004 and August 29, 2005, particularly the disclaimers in both Leases.   As of June 21, 2004 or, at the latest, August 29, 2005, Nutur knew or should have known that the statement attributed to Mr. Puech was either untrue or could not be relied on."   (West Franklin's Br. [Doc. #50] at 28-29.)   West Franklin further contends that "Mr. Thompson had actual knowledge as early as March 21, 2007 that proposed construction by the

29

Town will likely eliminate Lot 5 as a source of parking." (Id. at 29.)   That is, West Franklin argues that, "[i]n 2008 a series of written communications between Mr. Thompson and Mr. Puech show that Mr. Thompson had actual knowledge no later than November 7, 2008 that the statement attributed to Mr. Puech in January, 2004 was not true and the parking spaces in Lot 5 could be taken away." (Id. at 29.)

West Franklin's arguments address when Defendants knew or should have known that the statement attributed to Mr. Puech was false.   However, the appropriate inquiry is when Defendants knew or should have known that Mr. Puech made the statement with the knowledge that it was false.   That is, the fraud is alleged not because Mr. Puech made what turned out to be an incorrect statement regarding the parking lot; the fraud is instead alleged based on the allegation that Mr. Puech made the incorrect statements knowing that the statements were false.   The critical date of discovery is when Defendants knew or should have known that Mr. Puesch knew of the potential construction at the time he made the allegedly false and misleading statements.   There is no evidence to warrant a finding that this occurred prior to Mr. Puech's 2014 deposition as Defendants contend.   Ultimately, this issue is again better reserved for the jury, rendering entry of summary judgment inappropriate.   See Piles v. Allstate Ins. Co., 187 N.C. App. 399, 405, 653 S.E.2d 181, 186 (2007) (stating that appropriate date of discovery "of alleged fraud or negligence – or whether [the plaintiff] should have discovered it earlier through reasonable diligence – is a question of fact for a jury"); Forbis, 361 N.C. at 524, 649 S.E.2d at 386 (2007) ("Ordinarily, a jury must decide when fraud should have been discovered in the exercise of reasonable diligence.").

C.	Plaintiff's Motion for Judgment on its Claims [Doc. #47]

West Franklin has also filed a Motion for Summary Judgment seeking summary judgment in its favor on its affirmative claims for relief, and seeking summary judgment on Defendants' defenses asserted in the Answer.   More specifically, through its Motion, West Franklin asks that the Court grant its claims as follows:

> (a) as against Nutur, Nutur Holdings, P. Thompson and M. Thompson, jointly and severally, $377,944.56 on the Restated Promissory Note, plus prejudgment interest at the default rate of $128.69 per day from and after December 16, 2014 until the date of entry of judgment, and post-judgment interest at the default rate of 18% per annum on the unpaid balance of the judgment until collected, paid or discharged;
>
> (b) as against Nutur, P. Thompson and M. Thompson, jointly and severally, $360,945.00 on the Leases, Lease Guaranties and Forebearance [sic] Agreement, plus prejudgment interest at the default rate of $108.04 per day from and after December 16, 2014 until the date of entry of judgment, and post-judgment interest at the default rate of 12% per annum on the unpaid balance of the judgment until collected, paid or discharged;
>
> (c) as against all Defendants, dismissal of their Second, Third, Fourth, Fifth, Sixth and Seventh Defenses; and
>
> (d) award statutory attorneys' fees to the Plaintiffs' counsel pursuant to N.C.G.S. §6-21.2 under the procedure established by LR 54.2.

(Pl.'s Mot. Summ. J. [Doc. #47] at 2-3.)[8]

---

[8] West Franklin appears to seek recovery on both the Restated Promissory Note and the Leases.  In her declaration, Ms. Gunn avers that $377,944.56 represents "what is owed on the Restated Promissory Note as of December 14, 2014" (B. Gunn Decl. [Doc. #54] ¶ 19) and that $360,945.00 represents the "sums due and owing to West Franklin under the Leases" as of December 15, 2014 (see id. ¶ 15).   The Restated Promissory Note states that it "is given to evidence indebtedness for rent, additional rent and other charges past due and owing under [Nutur's] lease of the Pavilion I and Pavilion II premises located at 206 and 200 West Franklin Street in Chapel Hill, Orange County, North Carolina."   (Restated Promissory Note [Doc. #9-11] at 3.)   Accordingly, the amounts due under the Restated Promissory Note would, at least in part, already evidence amounts due under the Leases.   West Franklin appears to have accounted for this, as the accounting statement attached to Ms. Gunn's declaration related to amounts due under the Leases dates only as far back as March 2014, while the amount due under the Restated Promissory Note reflects only the original balance of the Note

31

i.    West Franklin's Claims

West Franklin seeks summary judgment in its favor on its claims for (1) Breach of Contract: Pavilion II Lease; (2) Breach of Contract: Pavilion I Lease; and (3) Breach of Contract: Restated Note, as against all defendants jointly and severally.    However, as an initial matter, given the foregoing conclusion that a genuine issue of material fact remains as to the Thompsons' personal liability as to obligations incurred after January 1, 2010, the Court is unable to render judgment as a matter of law on West Franklin's breach of contract claims as to Mr. and Mrs. Thompson's personal liability after that date.

As to the remainder of Plaintiff's breach of contract claims, Defendants contend that because questions of fact remain as to their own counterclaim for fraudulent inducement against West Franklin and Mr. Puech, summary judgment is inappropriate.    (See Defs.' Resp. [Doc. #69] at 21-22 ("Because the Court should not award West Franklin's and Dr. Puech's motions for summary judgment on Defendant's fraud claims, the Court also should not award summary judgment on West Franklin's breach of contract claims.").)    As Defendants note, a possible remedy for fraudulent inducement is rescission of the agreement.    See, e.g., Collier v. Bryant, 216 N.C. App. 419, 434, 719 S.E.2d 70, 83 (2011); Synovus Bank v. Okay Props., LLC, No. 1:11cv330, 2012 WL 3745280, at *7 (W.D.N.C. Aug. 28, 2012).    Accordingly, because genuine issues of material fact remain as to Defendants' claim of fraudulent inducement, the

---

with accrued interest.    (See B. Gunn Decl., Ex. A [Doc. 54-1].)    Regardless, further examination of the exact amount sought by West Franklin is warranted at trial.

Court cannot enter judgment as a matter of law on West Franklin's claims that relate to the relevant Agreements.

West Franklin argues that, "[e]ven if rescission is ordered, Nutur would still owe West Franklin 'the reasonable rental value of the premises during plaintiff's occupancy.'" (West Franklin's Reply [Doc. #74] at 6 (citing Lumsden v. Lawing, 107 N.C. App. 493, 504, 421 S.E.2d 594, 601 (1992)). That determination, however, is more appropriately made as part of the propriety of rescission, if Defendants prevail. In other words, the Court cannot, at this juncture, determine that West Franklin will, in any event, be entitled to some damages, and enter judgment to that effect.

ii.    Defenses

West Franklin also moves to dismiss Defendants' second, third, fourth, fifth, sixth and seventh defenses.[9] Those defenses are stated in Defendants' First Amended Answer and Counterclaim as (2) "Prior Material Breach of Contract," (3) "Failure of Consideration," (4) "Violation of the Equal Credit Opportunity Act," (5) "Frustration of Purpose/Discharge by Impossibility of Performance," (6) "Setoff," and (7) "Fraud." (See First Am. Complaint & Counterclaim [Doc. #37].) Defendants, in Response, fail to make any argument regarding their third and fourth defenses for "Failure of Consideration" and "Violation of the Equal Credit Opportunity Act." (See generally Defs.' Resp. [Doc. #69].) Moreover, during the deposition of Ms. Thompson, counsel for Defendants indicated that they were withdrawing their defenses for "Violation of the Equal Credit Opportunity Act." (See M. Thompson Dep.

---

[9] Defendants' first defense is simply the admission or denial of the allegations of the Complaint. (See First Am. Answer & Countercl. [Doc. #37] at 2.)

[Doc. #55-3] at 74:2-75:3.)  Accordingly, those two defenses should be deemed waived and/or withdrawn and dismissed by the Court.

As to the second defense for "Prior Material Breach of Contract," West Franklin contends that because "[c]ounts I through VI of Nutur's [c]ounterclaims overlap its Second Defense . . . [s]ummary judgment in favor of West Franklin on Counts I through VI should also be determinative of the Second Defense."  (West Franklin's Br. [Doc. #48] at 9.) However, as addressed above, the Court has determined that only Defendants' first and third counterclaims should be dismissed.   Absent any other argument for dismissal of this defense, and in light of the conclusion that genuine issues of material fact remain on these issues as set out at length above, dismissal of Defendants' second defense for "Prior Material Breach of Contract" is inappropriate at this stage.

Defendants state their fifth defense as "Frustration of Purpose/Discharge by Impossibility of Performance."   Defendants' basis for this defense is the alleged significant interruption caused by nearby Town construction and its effect on their ability to conduct their planned spa and educational services.   As an initial matter, as West Franklin argues, given that this defense centers on the Town construction, neither frustration of purpose nor impossibility of performance would provide any defense to arrearages or breaches occurring prior to the commencement of that construction in December 2010.   Moreover, frustration and impossibility are distinct concepts.   See Brenner v. Little Red Sch. House, Ltd., 302 N.C. 207, 211, 274 S.E.2d 206, 209 (1981).   To the extent Defendants' assert impossibility, that defense must fail.   That is, "'[i]mpossibility of performance is recognized in this jurisdiction as

34

excusing a party from performing under an executory contract if the subject matter of the contract is destroyed without fault of the party seeking to be excused from performance.'" WRI/Raleigh, L.P. v. Shaikh, 183 N.C. App. 249, 253, 644 S.E.2d 245, 247 (2007) (quoting Brenner, 302 N.C. at 210, 274 S.E.2d at 209.) Because it is undisputed that the leased premised remained such that it was not literally impossible for the Leases to be carried out, Defendants cannot assert impossibility of performance.

Under the doctrine of frustration of purpose, as explained by the North Carolina Supreme Court,

> [while] performance remains possible, [it] is excused whenever a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance. The doctrine of commercial frustration is based upon the fundamental premise of giving relief in a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose.

Brenner, 302 N.C. at 211, 274 S.E.2d at 209. "[I]f the parties have contracted in reference to the allocation of the risk involved in the frustrating event, they may not invoke the doctrine of frustration to escape their obligations." Id. "Essentially the doctrine of frustration of purpose requires proof that: (1) there was an implied condition in the contract that a changed condition would excuse performance; (2) the changed condition results in a failure of consideration or the expected value of the performance; and (3) the changed condition was not reasonably foreseeable." Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC, 215 N.C. App. 66, 79, 715 S.E.2d 273, 284 (2011).

In its First Amended Answer and Counterclaim, Defendant states:

35

Defendant Nutur did not anticipate nor allocate the risk of the events surrounding the thirty (30) month construction project within a few feet of the entrance to Defendant Nutur's location, including constant interruption from nearby dynamite blasting, the closure of access to the leased premises and the loss of parking. These events frustrated the purpose for which Defendant Nutur entered into the Pavilion I Lease and the Pavilion II Lease and as such excuse its further performance under both contracts.

(First Am. Answer & Coutercl. [Doc. #37] at 12.)

A genuine issue of material fact remains as to the propriety of this defense. As Defendants note, there is no indication that the risk associated with this type of nearby construction and interference with daily operations was allocated to Defendants. Moreover, there is evidence that West Franklin knew of the intended use of the premises and the significance of parking and access to the premises. Furthermore, the Court cannot resolve whether Defendants' purpose was frustrated. West Franklin provided audited financials purportedly submitted by Nutur to the United States Department of Education appearing to show that Nutur realized positive net revenues from its operation of the Aveda Institute for the years during which constructing was ongoing. (See West Franklin's Reply, Attach. A [Doc. #74-1]; see also P. Thompson Dep., Exs. 58-65 [Doc. #57-3].) If accurate, "a finding of practically total destruction of the expected value of the performance" would be questionable. However, Mr. Thompson declares that Nutur "[n]ot only did [ ] not meet [its] profit hopes, [but] actually lost money." (P. Thompson Decl. [Doc. #69-1] ¶ 22.) In fact, Mr. Thompson avers that "the construction cost Nutur approximately $2.6 million in lost profits." (Id.) Given the tension here, the Court should not resolve this issue at this stage. In addition, to the extent West Franklin contends that the construction was reasonably

foreseeable and therefore not within the scope of a "frustration of purpose," the Court notes that what was reasonably foreseeable cannot be determined as a matter of law. Accordingly, the Court should decline to dismiss Defendants' defense for frustration of purpose at this stage.

Defendants' sixth defense – "Setoff" – amounts to nothing more than a contention that any amount that Defendants are determined to be entitled should either be reduced by, or credited towards, the amount that West Franklin is determined to be entitled. As merely a matter of apportionment of damages, there is no need for the Court to address this matter at summary judgment.

Finally, Defendants' seventh asserted defense is for "Fraud," which is based on the same factual allegations that form Defendants' counterclaims of fraud and fraudulent inducement. As West Franklin notes, the Court's disposition of West Franklin's motion as to the propriety of summary judgment for those counterclaims is also determinative of Defendants' defense. Because the Court has determined that Defendants' counterclaims for fraud and fraudulent inducement cannot be decided as a matter of law, Defendants' seventh asserted defense should proceed as well.

IV. CONCLUSION

IT IS THEREFORE RECOMMENDED that Defendants Patrick J. Thompson's and Molly M. Thompson's Motion for Partial Summary Judgment [Doc. #45] be denied.

IT IS FURTHER RECOMMENDED that Plaintiff West Franklin Preservation Limited Partnership's Motion for Summary Judgment on its Claims [Doc. #47] be granted in

part and denied in part, in that the Court should grant the Motion for Summary Judgment as to Defendants' defenses of "Failure of Consideration" (third defense) and "Violation of the Equal Credit Opportunity Act" (fourth defense), and those defenses should be dismissed, and in addition, Defendants' fifth defense for "Frustration of Purpose/Discharge by Impossibility of Performance" should be limited only to "Frustration of Purpose," but the Motion for Summary Judgment should otherwise be denied.

IT IS FURTHER RECOMMENDED that West Franklin Preservation Limited Partnership and Antoine Puech's Motion for Summary Judgment as to the Counterclaim and Third Party Complaint of Nutur North Carolina, LLC [Doc. #49] be granted in part and denied in part, in that the Court should grant the Motion for Summary Judgment as to Defendants' first counterclaim for Breach of Section 2.06(a) (Quiet Enjoyment) and third counterclaim for Breach of Section 2.05(d) (Signage), and those counterclaims should be dismissed, but the Motion for Summary Judgment should otherwise be denied.

**Objections to this Recommendation are due October 13, 2015**, and pursuant to Local Rule 56.1(f), the Court may elect to rule on the Motions for Summary Judgment at the outset of trial.

This, the 28th day of September, 2015.

/s/ Joi Elizabeth Peake
United States Magistrate Judge
